FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

## Jul 16, 2024

SEAN F. MCAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JAMES LEIGHTY,<br><br>                        Plaintiff,<br><br>   v.<br><br>SPOKANE COUNTY, a municipal corporation; SHERIFF JOHN NOWELS, an individual; and SPOKANE COUNTY SHERIFF'S OFFICE, a subdivision of a municipal corporation,<br>                        Defendants. | NO. 2:24-CV-0165-TOR<br><br>ORDER GRANTING PRELIMINARY INJUNCTION |

BEFORE THE COURT is Plaintiff's Motion for Preliminary Injunction (ECF No. 4). This matter was submitted for consideration without oral argument. The Court has reviewed the record and files herein and is fully informed. For the reasons discussed below, Plaintiff's Motion for Preliminary Injunction (ECF No. 4) is GRANTED.

**BACKGROUND**

This motion for preliminary injunction arises out of an alleged violation of Plaintiff's First Amendment rights. Defendant Spokane County Sheriff's Office ("SCSO") has maintained an official Facebook page since 2010. ECF No. 10 at 2, ¶ 2. The page, which contains a "Law Enforcement Agency," label, lists the Office's website, phone number, email address, and physical address. ECF No. 4 at 2. Facebook, a popular social media website, allows users to create either "profiles," or "pages." ECF No. 1 at 4, ¶ 4.2. SCSO maintains a Facebook page, which may be viewed by anyone with a Facebook account. *Id*. at 6, ¶ 4.7. Unlike a profile, which allows more direct user to user contact, only the SCSO may make posts, but other users may "follow" the page which will in turn subscribe the user to all the publications made by SCSO. *Id*., ¶¶ 4.8, 4.9. At least three different members of SCSO monitor and post to the official Facebook page. ECF No. 10 at 2, ¶¶ 2, 3.

Users, regardless of whether they follow SCSO's page or not, may also interact with these posts by: "reacting" with an emoticon provided by Facebook ("like," "love," "care," "haha," "wow," "sad," or "angry,"); sharing the post on their personal profile; sending the post in a private message; sharing the post to another user's profile page; and commenting either directly on the post itself or in reply to another user who has already left a comment. *Id*., ¶ 4.9. The owner of a

Facebook post may monitor and manipulate comments on posts in two ways: "deleting" and "hiding." *Id.*, ¶ 4.15. When a comment is "deleted" it is no longer viewable by anyone, including the user who made the comment. *Id.*, ¶ 4.16. When a comment is "hidden," it becomes only viewable to the user who made the comment and fellow followers of that user, known as "friends," but invisible to all other users. *Id.*, ¶ 4.17.

The SCSO's page contains an "Intro" section, which states "Sheriff J. Nowels-Limited Public Forum Policy," and contains a link to a document entitled "Spokane County Sheriff's Office Social Media Disclaimer" ("Disclaimer"). ECF No. 4-2 at 2, ¶ 3. Clicking on the link will take a user to the full rules under the Disclaimer, which begins with a "catch all" statement, stating that SCSO "reserves the right to delete postings" *including but not limited* to the following policies:

> Defamatory, vulgar, obscene, abusive, profane, threatening, hateful, intimidating, or otherwise offensive language.
>
> Sexual content or links to sexual content.
>
> Malicious or offensive comments based on gender, race, class, ethnicity, national origin, political affiliation, religion, sexual orientation, disability or other classifications.
>
> Solicitations or advertisements, including promotion or endorsement of any financial, commercial, or nongovernmental agency.
>
> Attempts to defame or defraud any individual(s) or organizations.
>
> Posts or comments in support of or opposition to political campaigns or ballot measures.

Viruses or similar harmful programs, including spam and similar content.

Proprietary information or intellectual property that is posted without the approval of the owner. Copyrighted or trademarked images or graphics. Imagery not owned by the user.

Comments on matters unrelated to activities of Spokane County or Spokane Valley, associated boards, committees or programs, policies, operations, or general areas of responsibility and representation.

Information that may compromise the safety or security of the public, public officials, or public systems.

Information that violates a local, state, or national law or suggests or encourages illegal activity.

*Id*. at 7 (emphasis added).

The Disclaimer also states that the purpose of the maintained social media account is to "enhance communication, collaboration, information exchange, and transparency, streamline processes, and foster productivity." *Id*. And that SCSO "endorses the secure use of social media to enhance and support SCSO program goals and objectives." *Id*.

SCSO uses its Facebook page to update the public on the general happenings of the Office including: ongoing investigations, arrests made, the result of disciplinary actions against members of the agency, and welcoming new hires. *See generally* ECF Nos. 4-1, 4-2, 14-2, 14-3. Plaintiff describes himself as a "police accountability" advocate and engages with several law enforcement agencies on

1   social media.  ECF No. 4 at 3–4.  In March 2021, he commented on two SCSO

2   posts, one that was posted to welcome a new laterally hired deputy, and one that

3   detailed the results of an internal investigation of a deputy who fatally shot a

4   woman while responding to a call that she may be experiencing a mental health

5   crisis.  ECF No. 4-1 at 13, 15.

6       The new hire announcement, which was posted on March 17, 2021, stated in

7   part:

8       [The new hire] is a 29-year-old Lateral Deputy hire. She previously
        served with the Cheney Police Department as a patrol officer since
9       January 2018. Deputy [] is a Spokane native who attended Central
        Valley High School and North Central High School.

10

11      Please join us in welcoming her to the Spokane Sheriff's Office.

12  *Id*. at 13.

13      Plaintiff both left an "angry" reaction on the post and commented expressing

14  his displeasure with the new hire.  *Id*.  While the full comment is not before the

15  Court, the visible portion states:

16      Holy cow! Are you kidding me! She is the reason that Steven
        Anderson was killed in Cheney in 2018. She put herself in close
17      proximity of Steven when he was having a mental health crisis. That
        is when [the deputy] and the officers began firing on Steven . . .
18  *Id*.

19      On March 23, 2021, SCSO posted, "no criminal charges would be filed,"

20  against a deputy because he was justified in using deadly force while responding to

ORDER GRANTING PRELIMINARY INJUNCTION ~ 5

a call about a woman who was potentially experiencing a mental health crisis. *Id.* at 19. The woman was brandishing a knife, advancing toward the deputy in the lobby of a jail, and ignoring commands to drop the weapon when the deputy fatally shot her. *Id.* In response, Plaintiff commented, criticizing the deputy's actions the night of the shooting, specifically: that the deputy "allowed a secured location to become unsecured by propping open the door," "ignored de-escalation training," "allowed a person who was experiencing a mental health issue access to a secured area," and questioned why "a mental health crisis team was denied," in response to the emergency call. *Id.* at 19.

Plaintiff's comments on both March 2021 posts were "hidden," by SCSO. ECF No. 4 at 4. After discovering that his comments were only viewable to himself and his Facebook "friends," Plaintiff emailed the former Spokane County Sheriff requesting that his comments become visible to general Facebook users. *Id.* at 21. Plaintiff maintains he never received a response. *Id.* at 3, ¶ 7.

In October of 2023, Plaintiff states he commented on two SCSO Facebook posts, one regarding the arrest of an individual suspected of domestic violence, and one regarding a large drug operation investigation that resulted in the arrest of a primary suspect and seizure of drug and drug paraphernalia. *Id.* at 22, 28.

On the October 19, 2023, post detailing the investigation and arrest of a domestic violence suspect, Plaintiff left a comment stating in part, "[h]ow is it that

1    you already have an arrest? I thought investigations take time and the person

2    suspected of the violence is not arrested until after a thorough, complete, and

3    unbiased investigation . . ."  ECF No. 4-1 at 41.

4         As to the October 26, 2023, post regarding the large drug bust, Plaintiff

5    commented:

6              How did you already arrest the suspect? According to Sheriff Nowels,
              you have to conduct a thorough, complete, and unbiased investigation
7              into the suspect's actions and this incident before you can arrest them.

8         Can you explain how an arrest was already made?

9    *Id.* at 45.

10        Both Plaintiff's comments on the October 2023 posts were hidden by SCSO,

11   while the Office simultaneously "liked," comments that appeared supportive.  ECF

12   No. 4 at 5.

13        Plaintiff commented on three posts in 2024, one announcing the internal

14   investigation into an assault on a suspect by a deputy during an arrest, one detailing

15   an investigation into a civilian shooting, and one concluding an ongoing

16   investigation of a murder suspect that ended with a conviction.  *Id.* at 5–6.

17        The announcement of the investigation into an assault on a suspect, posted

18   on February 21, 2024, is not currently before the Court.  ECF No. 4 at 5.  But

19   Plaintiff stated in part his comment, "[w]hy weren't you doing an investigation

20   already? It was obvious from the beginning that what [the deputy] did was wrong.

Case 2:24-cv-00165-TOR    ECF No. 15    filed 07/16/24    PageID.292    Page 8 of 34

And all other deputies that were there laughing with, and covering for [the deputy] should be investigated as well. This incident revealed a horrible law enforcement culture within the Spokane County Sherriff's Office!"  ECF No. 4-1 at 49.

On March 20, 2024, the SCSO posted that the investigation into a domestic violence situation was complete and had made an arrest.  ECF No. 4-2 at 35. Plaintiff commented:

> How is it that on March 20, 2024, at approximately 9:40 am, Spokane County Sheriff's Deputies responded to a reported domestic violence incident and you already have an arrest and a report that is released, but it took you 18 months to finish the investigation of [members of the Sheriff's Office] killing Robert Bradley?
>
> Why did it take you 6 months after the beating of Mr. Hinton by [a Sheriff's deputy] to decide to order the Spokane County Sheriff's Office of Professional Standard to begin a comprehensive internal investigation to identify any and all policy violations and what changes or possible training is needed to prevent this from happening again?

ECF No. 4-1 at 53.

SCSO announced that a murder investigation ended with a conviction on May 8, 2024.  ECF No. 4 at 6.  The post detailed the efforts of the Major Crimes Unit in their work to "develop probable cause" in order to charge the individual responsible.  ECF No. 4-1 at 57.  Plaintiff initially commented, asking when a deputy would be charged with aggravated assault for beating an elderly man.  *Id*. The murder victim's daughter replied to Plaintiff's comment, "[w]hat does that

ORDER GRANTING PRELIMINARY INJUNCTION ~ 8

have to do with my fathers murderer?"  *Id*.  Plaintiff replied:

> [N]othing to take away from your grief. I just ask the sheriff to have the same due diligence with crimes committed by his own deputies. We have seen his deputies kill and beat innocent unarmed people and they get away with it. I ask the same effort and honesty they put forth capturing and punishing your father's killer.
>
> My heart goes out to your family.

ECF No. 4-1 at 58.

All three of the comments Plaintiff made in 2024 were hidden by SCSO. ECF No. 4 at 5–6.

Defendants argue that Plaintiff's comments were properly hidden because they violated the SCSO social media policies regarding defamatory comments, and a "catch all" provision that "reserves the right to block users and/or delete comments that are inconsistent with [the] disclaimer."  ECF No. 9 at 3. Defendants state that often Plaintiff's comments were removed because they were patently false, as his criticism of various deputies were disproven in independent investigations exonerating the officers of wrongdoing.  ECF No. 10 at 4–13, ¶ 8, *see generally* ¶ 10; ECF Nos. 10-2–10-7.

Defendants also state that Plaintiff's comments were "off-topic," and therefore SCSO had the discretion to hide them.  ECF No. 9 at 3.  Defendants offer that many of the aforementioned comments fall under the "off-topic" rule that it enforces.  *See generally* ECF No. 10, ¶ 10.  Defendants also point to a comment

Plaintiff left stating, "Do you just keep these in a folder called 'Deflect?' Let's get back to the homeowner your deputy shot after that homeowner called for help regarding a prowler . . ." on its post entitled "Gang Associated Violence Press Conference," as removed for being unrelated to the content of the post. *Id*. at 7, ¶10(c). Additionally, Defendants argue that Plaintiff's comment on the May 8, 2024, post regarding the conclusion of a murder investigation was removed because it "appeared offensive to a murder victim's daughter." *Id*. at 13, ¶ 10(j)(i). Moreover, other comments, not just those from Plaintiff, have been hidden for not complying with the Disclaimer. *Id*. at 5, ¶ 9.

Plaintiff has moved for a preliminary injunction, requesting that his comments be restored, and that Defendants be enjoined from removing future comments on a discretionary basis. ECF No. 4 at 2.

## DISCUSSION

### I.   Preliminary Injunction Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008); *see also All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).

"A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the

1    absence of preliminary relief, (3) that the balance of equities tips in his favor, and

2    (4) that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

3    "[P]laintiffs must establish that irreparable harm is likely, not just possible, in

4    order to obtain a preliminary injunction." *All. for the Wild Rockies*, 632 F.3d at

5    1131.

6        The Ninth Circuit has also developed a "sliding scale approach," which

7    balances the elements of the *Winter* test.  *Id*.  Under this approach, "'a preliminary

8    injunction could issue where the likelihood of success is such that 'serious

9    questions going to the merits were raised and the balance of hardships tips sharply

10   in [plaintiff's] favor.'"  *Id.* (quoting *Clear Channel Outdoor, Inc. v. City of Los*

11   *Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)); *see also Farris v. Seabrook*, 677 F.3d

12   858, 864 (9th Cir. 2012) ("We have also articulated an alternate formulation of the

13   *Winter* test, under which serious questions going to the merits and a balance of

14   hardships that tips sharply towards the plaintiff can support issuance of a

15   preliminary injunction, so long as the plaintiff also shows that there is a likelihood

16   of irreparable injury and that the injunction is in the public interest." (internal

17   quotation marks and citation omitted)).

18       A preliminary injunction can either be prohibitory or mandatory.  *Marlyn*

19   *Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 878 (9th Cir.

20   2009).  A prohibitory injunction preserves the status quo which is the "last,

uncontested status which preceded the pending controversy." *Id*. at 879.  A

mandatory injunction "orders a responsible party to take action." *Id*. at 878.

Mandatory injunctions are disfavored and require a higher showing that the "facts

and law clearly favor the moving party." *Garcia v. Google*, 786 F.3d 733, 740 (9th

Cir. 2015).  Here, Plaintiff is requesting that the Court mandate his old comments

be restored so they are viewable by the general public and enjoin Defendants from

removing future comments on a discretionary basis.  ECF No. 4 at 2.  As this

request is changing the current status quo, and requires action from Defendants,

Plaintiff is requesting both a mandatory and prohibitory injunction.

## II.     Likelihood of Success on the Merits

The First Amendment of the United States Constitution includes several

protections, including against government abridgment of the freedom of private

speech.  U.S. CONST. AMEND. I.  This "free speech clause" is applied to states and

local governments under the Due Process Clause of the Fourteenth Amendment.

*Gitlow v. New York*, 268 U.S. 652, 666 (1925).  Under the First Amendment, "a

government, including a municipal government vested with state authority, 'has no

power to restrict expression because of its message, its ideas, its subject matter, or

its content.'"  *Reed v. Town of Gilbert, Ariz*., 576 U.S. 155, 163 (2015) (quoting

*Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).  However, not all

speech is secured under the First Amendment, and the Court must first determine

whether Plaintiff engaged in protected speech before deciding if it can be regulated. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). While the First Amendment generally allows a general "breathing space," of speech free from government interjection, *United States v. Alvarez*, 617 F.3d 1198, 1206 (9th Cir. 2010), *aff'd*, 567 U.S. 709 (2012), certain historical categories of speech go entirely unprotected by the First Amendment including obscenity, defamation, fraud, and incitement of violence, which have "never been thought to raise any Constitutional problem." *United States v. Stevens*, 559 U.S. 460, 469 (2010); *R.A.V. v. City of St. Paul,* 505 U.S. 377, 383, (1992); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). If a plaintiff has not engaged in protected speech, the inquiry into the constitutionality of the government regulation of the speech ends. *Cornelius*, 473 U.S. at 797.

Here, Defendants contend that Plaintiff engaged in defamatory speech, which is not only against their internal policy, but also a kind of speech that is unprotected by the First Amendment. ECF No. 9 at 8. Defamation is an action in tort, and therefore is examined under state law principles. *Milkovich v. Lorain J. Co.,* 497 U.S. 1, 14 (1990). In Washington, defamation requires a showing of (1) a false statement, (2) lack of privilege, (3) fault, and (4) damages. *Herron v. KING Broadcasting Co.*, 112 Wash. 2d 762, 768 (1989). A true statement serves as a complete defense to a claim of defamation. *Mark v. Seattle Times*, 96 Wash. 2d

473, 482 (1981).  However, "[b]efore the truth or falsity of an allegedly defamatory statement can be assessed," the party asserting defamation, "must prove that the words constituted a statement of fact, not an opinion."  *Robel v. Roundup Corp*., 148 Wn.2d 35, 55 (2002).  To determine whether a statement amounts to an opinion, courts examine (1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts.  *Dunlap v. Wayne*, 105 Wash. 2d 529, 737–38 (1986).  If a statement is considered an opinion, it is nonactionable under a claim of defamation as protected speech.  *Camer v. Seattle Post–Intelligencer*, 45 Wash.App. 29, 39 (1986) (citing *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 339 (1974)).

Defendants here do not contest that the comments will likely prevail against the charge of defamation as opinion statements on a matter of public debate though also confusingly argue that the comments cannot be a matter of public concern if they are off topic.  ECF No. 9 at 7; *see Info. Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781, 784 (9th Cir. 1980).  In support of their argument that the comments are defamatory, Defendants offer proof that many of Plaintiff's statements deal in large part with internal investigations that have exonerated the individual deputies involved.  *See* ECF Nos. 10-2 at 2, 10-3 at 2, 10-4 at 2, 10-5 at 2, 10-6 at 2, 10-7 at 2.  In examining the *Dunlap* factors, it seems likely that

Plaintiff's comments are expressing his opinion on a matter of public debate and are therefore protected under the First Amendment.

Under the first factor, "the medium and context," of publication, the *Dunlap* Court noted that "statements of opinion are expected to be found more often in certain contexts, such as editorial pages or political debates," 105 Wash. 2d at 539. Statements should be considered in their entirety, and the court should note if the speaker qualified the statement in any way. *Id.* Here, a social media website such as a Facebook page is an expected place to find statements of opinion and debate, especially given that one of the stated purposes of the SCSO page is to, "enhance communication, collaboration, information exchange, and transparency, streamline processes, and foster productivity." ECF No. 10-1 at 2. And the existence of other comments, both positive and negative with respect to SCSO, establish that the Facebook page is understood as a place that is amendable to the exchange of ideas. While Plaintiff almost never used qualifiers such as, "in my opinion," when commenting, some of his comments in whole or in part contained questions that give a similar effect to a qualifying statement such as:

How is it that you already have an arrest?

*Id.* at 41.

How did you already arrest the suspect . . . can you explain how an arrest was already made?

1    *Id*. at 45.

2         How? Why weren't you doing an investigation already? It was
3         obvious from the beginning that what [the sheriff's deputy] did was
         wrong.

4    *Id*. at 49

5         How is it on March 20, 2024 . . . you already have an arrest and a
6         report that is released but it took you 18 months to finish [an internal
         investigation]? Why did it take you 6 months after the beating of [] by
7         [a Sheriff's deputy] to order the Spokane County Sheriff's Office of
         Professional Standards to begin a comprehensive internal
8         investigation to identify any and all policy violations and what
         changes or possible training is needed to prevent this from happening
9         again?

10    *Id*. at 53.

11        When will your deputy be charged with aggravated assault on the
         elderly man that he pulled out the car and beat for resting in a parking
12        lot after driving a long ways?

13    *Id*. at 58.

14        Second, those engaged with an interactive Facebook page, such as the one

15   SCSO maintains, should anticipate that such website is the type of forum that

16   facilitates "exaggeration and personal opinion," and expect a speaker to use,

17   "rhetoric or hyperbole." *Robel*, 148 Wash. 2d at 56; *Dunlap*, 105 Wash. 2d at 539.

18   Supporters and critics of a particular action of law enforcement may react with

19   strong emotion, demonstrated aptly here by competing comments on many of the

20   posts provided.  ECF No. 4-1 at 16, 33, 39, 43, 51, 55; ECF No. 4-2 at 9–14, 17–

ORDER GRANTING PRELIMINARY INJUNCTION ~ 16

19, 24, 44.  Moreover, "speech on public issues occupies the highest rung of the

hierarchy of First Amendment values and is entitled to special protection."

*Connick v. Myers*, 461 U.S. 138, 145 (1983); *see also Dun & Bradstreet, Inc. v.*

*Greenmoss Builders, Inc*., 472 U.S. 749, 759 (1985) (speech on "matters of public

concern" are "at the heart of the First Amendment's protection"); *Garrison v.*

*Louisiana*, 379 U.S. 64, 74–75 (1964) (holding "speech concerning public affairs is

more than self-expression; it is the essence of self-government").  Speech typically

deals with public concern when it can be "fairly considered as relating to any

matter of political, social, or other concern to the community," or when "it is a

subject of legitimate news interest; that is, a subject of general interest and of value

and concern to the public."  *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal

citations omitted).  Many of the comments ultimately touch on Plaintiff's opinion

on SCSO's oversight and hiring practices as detailed above, which are a matter of

public concern given SCSO's position as a law enforcement agency.

　　　"The third and perhaps most crucial factor to consider is whether the

statement of opinion implies that undisclosed facts support it."  *Dunlap*, 105

Wn.2d at 539–40.  Speech is only actionable as defamation if it "implies the

allegation of undisclosed defamatory facts."  *Id*. at 540 (quoting Restatement

(Second) of Torts § 566).  Stated differently, "[a]rguments for actionability

disappear when the audience members know the facts underlying an assertion and

can judge the truthfulness of the allegedly defamatory statement themselves." *Id*. Many of Plaintiff's comments deal directly with the content of the post and the press release contained therein when applicable. ECF No. 4-1 at 19, 37, 41, 45, 49. Plaintiff's comments regarding how a lateral hire, "was the reason Steven Anderson was killed in Cheney in 2018," is based on disclosed facts, as a detailed account of events of the law enforcement response is available. ECF No. 10-2. Even in situations where the comment references a different topic than the post, other comments suggest that the information Plaintiff referenced is publicly available, though that information is not currently before the Court. ECF No. 4-1 at 28–29. And still in other cases, as was detailed under the first factor, Plaintiff was posing a question to SCSO. *Id*. at 53. A Facebook user who comes across Plaintiff's comments likely has the ability to review disclosed facts or assess the context of the comment and determine whether he or she agrees with Plaintiff's view of the information, making these comments opinion statements.

Based on Defendants' concession, and the likelihood that the speech is covered as an opinion statement on a matter of public debate, Plaintiff's posts to SCSO Facebook page are not excludable as a form of unprotected speech.[1]

---

[1] Neither party raised the issue of whether the Court should address actual malice based on SCSO or any individual deputy's status as public officials. *Caruso v. Loc. Union No. 690 of Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen &*

In order to make his 42 U.S.C. § 1983 claim, Plaintiff must show that Defendants (1) acted under the color of state law and (2) violated a right, privilege, or immunity found in the Constitution, here the First Amendment. *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

For the purposes of this preliminary injunction, Defendants do not challenge that the activity on the Spokane County Sheriff's Office Facebook page was published under the color of state law. Nevertheless, the at issue "Media Disclaimer," explicitly states that the purpose of the Office's maintained social media page is to "enhance and support SCSO program goals and objectives." ECF No. 4-2 at 7. To be sure, it is apparent that (1) an amorphous poster purporting to speak for SCSO on the official Facebook page "possessed actual authority" to speak for the Office and (2) posting updates on the happenings of SCSO, including arrests made and news surrounding the Office, as well as "hiding" comments that it viewed as a violation of the Disclaimer, was a show of the exercised authority of SCSO. *Lindke v. Freed*, 601 U.S. 187, 188 (2024). To place a finer point on the actual authority prong, the Supreme Court in *Lindke* emphasized that state power

*Helpers of Am*., 100 Wash. 2d 343, 352 (1983) (quoting *Gertz*, 418 U.S. at 342). Regardless, the Court finds the defamation analysis largely inapplicable because Plaintiff's statements could be reasonably considered protected opinion statements.

can derive from "statute, ordinance, regulation, custom, or usage." *Id*. at 200.

Based on the record as it currently exists, SCSO has used this Facebook page to

post updates since 2010 and the Disclaimer states:

> This social media site is intended to serve as a mechanism for communication between the public and SCSO on the listed topics. Any comments submitted to SCSO social media sites are public records subject to disclosure pursuant to RCW 42.56.

ECF No. 10-1 at 2.

Finding that the Facebook page operates as an act under the color of state

law, the Court moves to the second prong of the § 1983 analysis, whether the

SCSO violated Plaintiff's First Amendment rights.

*A. Forum Analysis*

Determining whether SCSO was justified in hiding Plaintiff's comments on

various posts will largely turn on what kind of forum the official Facebook page is.

While the First Amendment protects the ability to engage in public debate and

share opinions, the privilege is not absolute. *Heffron v. Int'l Soc. for Krishna*

*Consciousness, Inc*., 452 U.S. 640, 647 (1981). In certain spaces, the government

may place restrictions on speech, and these areas have been divided into three

categories: traditional public forums, designated public forums, and limited public

forums. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44, 45, 46,

47 (1983).

1    Traditional public forums are areas such as streets and parks that "have

2    immemorially been held in trust for the use of the public, and, time out of mind,

3    have been used for purposes of assembly, communicating thoughts between

4    citizens, and discussing public questions." *Id*. at 45. Government regulation on

5    speech in a traditional public forum that amounts to a content restriction must

6    demonstrate that such regulation serves a compelling government interest and is

7    narrowly tailored to achieve that end. *Carey v. Brown*, 447 U.S. 455, 461 (1980).

8    Content-neutral restrictions, those that regulate the time, place, and manner of

9    speech, must serve a significant government interest, and leave open alternative

10    channels of communication. *Perry*, 460 U.S. at 45.

11    Designated public forums are created by a government for "expressive use

12    by the general public or by a particular class of speakers," within a space that has

13    not traditionally been used for assembly or debate. *Arkansas Educ. Television*

14    *Comm'n v. Forbes*, 523 U.S. 666, 677–78 (1998). Designated public forums

15    require that a government action create a space for "general access," to property for

16    speech. *Id*. at 79. Other than the government's ability to close a designated public

17    forum whenever it chooses, the forum functions identically to a traditional public

18    forum and speech receives the same protections. *Perry*, 460 U.S. at 45–46.

19    Finally, a government creates a limited public forum when it grants

20    "selective access," by placing speaker-based or subject matter-based limitations on

1  an otherwise nonpublic forum.  *Seattle Mideast Awareness Campaign v. King*

2  *Cnty.*, 781 F.3d 489, 497 (9th Cir. 2015) (citing *Cornelius*, 473 U.S. at 806).

3  Government restrictions on content-based speech in a limited public forum is

4  permissible, provided it is reasonable and viewpoint neutral.  *Id*. at 496.

5         Today, social media functions as one of the most important places for the

6  exchange of views.  *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017)

7  (noting that Facebook in particular, has become an important space for debate).

8  Even still, the Supreme Court has affirmatively rejected that the concept of

9  traditional public forum extends outside the confines of its historical categories of

10  areas like parks and sidewalks, and no party to this matter argues that the SCSO

11  Facebook page is a traditional public forum.  *United States v. Am. Libr. Ass'n, Inc*.,

12  539 U.S. 194, 206 (2003).  Instead, the question is whether the page qualifies as a

13  designated public forum or a limited public forum.

14         In order to distinguish a public forum from a limited public forum, the Ninth

15  Circuit has adopted a test to examine the intent of the government in creating the

16  forum.  The existence of any policy the government has adopted to govern the

17  forum, and how that policy is implemented in practice, assists in determining the

18  type of forum created.  *Seattle Mideast Awareness Campaign*, F.3d at 497 (quoting

19  *Cornelius,* 473 U.S. at 802).  Whether the government requires speakers to obtain

20  permission before accessing the forum, under pre-established guidelines that

impose speaker-based or subject-matter limitations, also aid in determining the

governments intent.  *Id*.  However, "[i]f the policy requires speakers to obtain

permission under guidelines whose terms are routinely ignored, such that in

practice permission is granted 'as a matter of course to all who seek [it],' the

government may have created a designated public forum."  *Id.* (quoting *Perry*, 460

U.S. at 47).  Additionally, if the type of property at issue is one that is typically

"designed and dedicated for expressive activities," the forum may have been

intended to encompass more speech.  *Id*. (quoting *Cornelius*, 473 U.S. at 802).

The Facebook page in question has characteristics of both a designated

public forum and limited public forum.  The SCSO Facebook brands itself as a

"limited public forum."  ECF No. 4 at 3.  While only SCSO may make posts on the

page, thereby in a way requiring prior permission to speak on the page and

establishing the type of content discussed, anyone may comment on those posts,

not just those who are "followers," suggesting it's an open forum for debate.  *See*

*Perry*, 460 U.S. at 47; *Seattle Mideast Awareness Campaign*, 781 F.3d at 497–98.

Defendants assert that SCSO has hidden other comments for Disclaimer violations

but have provided no examples.  ECF No. 10 at 5, ¶ 9.  And generally speaking,

Facebook has developed into a forum that is conducive for the exchange of ideas,

making it designed and dedicated for expressive activities as described in *Seattle*

*Mideast Awareness Campaign*.  *See Hernandez v. City of Phoenix*, 43 F.4th 966,

978 (9th Cir. 2022) (quoting *Liverman v. City of Petersburg*, 844 F.3d 400, 410 (4th Cir. 2016)) (finding that Facebook posts during an employment dispute were intended to be viewed by the general public thereby denoting "an intent to communicate with the public or advance a political or social view").

The crucial turning point here is the rules of the SCSO Disclaimer and the consistency with which they are applied. "[C]onsistency in application is the hallmark of any policy designed to preserve the non-public status of a forum. A policy purporting to keep a forum closed (or open to expression only on certain subjects) is no policy at all for purposes of public forum analysis if, in practice, it is not enforced or if exceptions are haphazardly permitted." *Hopper v. City of Pasco*, 241 F.3d 1067, 1076 (9th Cir. 2001). Plaintiff argues that his comments were removed, while other comments that also violated provisions of the Disclaimer remain visible. ECF No. 4 at 11. In violation of "[d]efamatory, vulgar, obscene, abusive, profane, threatening, hateful, intimidating, or otherwise offensive language," provision, Plaintiff offers the following as examples of comments that were permitted to stay up on SCSO posts:

It's a shame he didn't resist and have to be "put down"

Tree/rope=no chance of re-offending

Please bring back the death penalty

Another one that should be planted in the ground. Too bad the neighbor didn't do us all the favor

1

2     To [sic] bad you had to use a tazer would be nice if you could just go
      lethal

3     Let's start beating kids again

4     ECF No. 14 at 6.

5          The Court also notes additional comments that appear to violate other

6     provisions of the Disclaimer remained available for public view.  A comment

7     reading "[t]ypical gays," on a post related to a civilian shooting on March 20,

8     2024, could feasibly be said to violate the "malicious or offensive comments based

9     on gender, race, class, ethnicity, national origin, political affiliation, religion,

10    sexual orientation, disability or other classifications," provision and is also "off

11    topic."  ECF No. 4-1 at 43.  And there are other examples of comments that are

12    "off topic," of the original post that still appear on the page.  ECF Nos. 4-1 at 29,

13    4-2 at 44, 45.

14         There are also many posts with comments expressing a similar sentiment to

15    Plaintiff's view that are permitted to remain publicly viewable.  On a March 8 post,

16    Plaintiff commented, "[l]et's get back to the homeowner your deputy shot after that

17    homeowner called for help regarding a prowler," which was hidden.  ECF No. 4-1

18    at 28.  However, a comment on the same post which states "a better pr[e]ss

19    conference for today might have been about why a civilian was shot by one of your

20    deputies last night," was permitted to remain.  *Id*. at 29.  Similarly, on Defendants'

March 23, 2021, post announcing no charges would be filed related to the deputy shooting of a woman on December 4, 2020, Plaintiff's comment criticizing the actions of the deputy in deescalating tactics was removed, but a comment stating, "never should have made it through the door," referring to deputy action was permitted to remain visible, as well as at least three other comment threads containing criticism of actions of the deputy. *Id*. at 33–34; ECF No. 4-2 at 13. And on an October 19, 2023 post regarding the result of a domestic violence case, Plaintiff's comment questioning the speed of investigation was removed, but comments like, "[s]ee how you arrested this guy but not your own officer who committed elder abuse, among other serious crimes," and "[w]ow I'm surprised I would have bet this crime was [member of the sheriff's office]'s MO," were still visible to all Facebook users, to name just a few. *Id*. at 41; *see also* ECF No. 4-2 at 24 (other comments describing a deputy as a "thug," or a "loose cannon"). The SCSO post on February 21, 2024, regarding the internal investigation of a deputy, contains visible comments nearly identical to Plaintiff's hidden comment criticizing the Office. *Id*. at 49.

While SCSO denotes its page as a "limited public forum," its lack of consistency in its enforcement of the Disclaimer, and the debate focused forum of social media, tip the scale toward classifying the page as a designated public forum. Because SCSO has not enforced the provisions of the Disclaimer equally,

ORDER GRANTING PRELIMINARY INJUNCTION ~ 26

permitting some comments criticizing the Office as well as comments praising the Office to remain, as well as providing no evidence of the comments that have been hidden as a result of the Disclaimer, the rules regulating the Facebook page have become "no policy at all." *Hopper v. City of Pasco*, 241 F.3d 1067, 1078 (9th Cir. 2001).

Neither of Defendants' arguments justifying hiding Plaintiff's comments satisfy the requirements of "narrowly tailored," or to "further a government interest," that strict scrutiny demands. *Perry,* 460 U.S. at 45–46. First, the "off-topic," rule that Defendants rely on does not explicitly appear in Disclaimer, instead it is inferred from the following provision:

> SCSO reserves the right to delete postings that are inconsistent with the policies in this disclaimer, including, but not limited to, comments that contain the following prohibited words, text, or information.

ECF No. 10-1 at 2.

This type of discretion is not narrowly tailored, as it essentially leaves open to Defendants the ability to hide any comment they feel might be "inconsistent" with the policy. Defendants offer that implementing the rule serves the government interest of better interacting with comments that are "on topic." ECF No. 9 at 11–12. However, this is not the kind of government interest that is compelling enough to restrict otherwise protected speech. Moreover, Defendants' explanation of the "off-topic" rule is directly at odds with the Disclaimer, which

states that comments will be deleted that are, "on matters unrelated to activities or

Spokane County or Spokane Valley, associated boards, committees or programs,

policies, operations, or general areas of responsibility and representation." ECF 10-

1 at 2.  So even if the regulation of Plaintiff's speech for being "off-topic" was a

permissible standard, in reviewing Plaintiff's comments, all were generally about

the happenings of the Sheriff's Office, and many were directly relevant to the post

they appeared under, making them passable under the stated rules of the

Disclaimer.

Second, Defendants argue that Plaintiff's rehashing of past conduct of

members of SCSO amounts to defamation, and at one point upset a murder

victim's daughter.  ECF No. 9 at 8, 12.  However, as the Court discussed above,

Plaintiff's comments better reflect his opinion of the operation of SCSO, and the

First Amendment explicitly protects criticism of government officials.  *New York

Times Co. v. Sullivan*, 376 U.S. 254, 276 (1964) ("The First Amendment, said

Judge Learned Hand, 'presupposes that right conclusions are more likely to be

gathered out of a multitude of tongues, than through any kind of authoritative

selection.  To many this is, and always will be, folly; but we have staked upon it

our all.'").  And likewise, speech may not be regulated just because it is unpleasant

or unpopular.  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509

(1969).  Plaintiff's expression regarding SCSO is seemingly aimed at criticizing

1  the practices of the Sheriff's Office, the handling of what he perceives to be

2  deputy misconduct while on duty, and inadequate policies surrounding internal

3  investigations, rather than intending to defame individual deputies.  This type of

4  criticism is central to the First Amendment, and Plaintiff's speech is therefore

5  protected.  *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966); *see also New York Times*

6  *Co.*, 376 U.S. at 270 (discussing a "national commitment to the principle that

7  debate on public issues should be uninhibited, robust, and wide-open, and that it

8  may well include vehement, caustic, and sometimes unpleasantly sharp attacks on

9  government and public officials").  Defendants have failed to provide justification

10  to overcome this protection.

11      However, even if Defendants' Facebook page was moderated with a

12  Disclaimer that was consistently enforced, and therefore could be considered a

13  limited public forum, Defendants have regulated Plaintiff's comments based on his

14  viewpoint.  In order to regulate speech in a limited public forum, the restriction

15  must be reasonable for the purposes of the forum and viewpoint neutral.

16  *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995)

17  (internal citations omitted).  In enforcing limitations on speech in a limited public

18  forum, the standard for inclusion or exclusion must be "unambiguous and definite.

19  *Christ's Bride Ministries, Inc. v. Se. Pennsylvania Transp. Auth.*, 148 F.3d 242,

20  251 (3d Cir. 1998).  Further, restrictions designed to suppress specific speakers are

not supported by the First Amendment. *U.S. v. Play Entertainment Group, Inc.,* 529 U.S. 803, 812 (2000). When it establishes a forum, even a limited forum, the government may not regulate private speech in the form of favoring one speaker over another, *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804 (1984), or because it disagrees with the message, *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 641–643 (1994). *See also R.A.V.,* 505 U.S. at 391; *Rosenberger,* 515 U.S. at 829. "Absent objective standards, government officials may use their discretion to interpret the policy as a pretext for censorship." *Hopper,* 241 F.3d at 1077 (9th Cir. 2001).

It appears that Defendants have hidden Plaintiff's comments because he is the individual commenting, evidenced by other comments criticizing SCSO that remain visible on the page, and this application of the asserted limitations of the forum is unreasonable. While Defendants assert that other comments have been hidden under the rules of the Disclaimer, the Court is skeptical that Plaintiff's comments fall into any enumerated portion of the Disclaimer, and the "catch all" provision seems to be the kind of ambiguous standard that allows the SCSO to limit speech it disagrees with, which is unconstitutional. See *Hopper,* 241 F.3d at 1077. Defendants' hiding Plaintiff's critical comments is made more insidious against the backdrop of the numerous comments praising SCSO still visible.

In sum, Plaintiff has demonstrated a likelihood of success on the merits. It

1    appears that Defendants' have created a designated public forum and have failed to

2    satisfy strict scrutiny to justify "hiding," Plaintiff's comments.  However, even if

3    Defendants have created a limited public forum, SCSO has still impermissibly

4    discriminated against Plaintiff's viewpoint. [2]

5    **III.    Irreparable Harm**

6           In the Ninth Circuit, "'a party seeking preliminary injunctive relief in a First

7    Amendment context can establish irreparable injury sufficient to merit the grant of

8    relief by demonstrating the existence of a colorable First Amendment claim.'"

9    *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (internal citation and

10   quotation omitted); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of

11   First Amendment freedoms, for even minimal periods of time, unquestionably

12   constitutes irreparable injury.")  Because Plaintiff has shown that his First

13   Amendment right to free speech has likely been violated, he has established

14   irreparable injury for the purposes of a preliminary injunction.

15

16   [2] Defendants present that Plaintiff's claim is untenable because he did not comply

17   with provisions in Idaho Code § 6-906.  The Court infers that Defendants intended

18   to cite to Wash. Rev. Code § 4.92.100.  Nevertheless, the Court's Preliminary

19   Injunction analysis does not change.  Defendants may reassert an argument

20   pertaining to § 4.92.100 in any potential future filing in this matter.

## IV.     Balance of Equities

At the present stage, it appears that the balance of equities favors Plaintiff. However, if later facts come to light revealing that Plaintiff has engaged in defamatory speech, or another justification for hiding Plaintiff's comments surfaces, then the scale would tip in favor of Defendants.  Given the uncertainty involved in the progress of this case and future pleadings, this factor weighs neutrally.

## V.     Public Interest

"It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions."  *New York Times Co.*, 376 U.S. at 269.  A public interest is served in enjoining Defendants from utilizing the SCSO Facebook page to suppress constitutionally protected ideas the Office finds embarrassing, annoying, or unsavory.

## VI.     Bond Waiver

Plaintiff argues that no bond should be required because Defendants will suffer no harm if enjoined.  ECF No. 4 at 15.  Defendants argue that the Court should require a bond that amounts to attorney's fees for responding to the preliminary injunction.  ECF No. 9 at 15.  Federal Rule of Civil Procedure 65(c) states that the court may issue a preliminary injunction if "the movant gives security in the amount the court considers proper to pay the costs and damages

sustained by any party found to have been wrongly enjoined or restrained."

However, a district court "may dispense with the filing of a bond when it

concludes there is no realistic likelihood of harm to the defendant from enjoining

his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

Here, no bond is required because Defendant's face no likelihood of harm in

restoring Plaintiff's comments and allowing him to post constitutionally protected

speech so long as their Facebook page remains open to public debate.  The Court is

confident that Defendants will face little chance of harm because many of

Plaintiff's sentiments regarding actions of individual deputies or the Office as a

whole are expressed by other visible comments on posts that existed on

Defendant's Facebook page at the time this action commenced.

## CONCLUSION

Finding that Plaintiff is likely to be successful on the merits of the claim, and

the remaining factors either weigh neutrally or in his favor, the Court enjoins

Defendants from hiding any of his future constitutionally protected comments

during this litigation and requires that past comments be made publicly visible.

Should Plaintiff engage in speech not covered by the First Amendment, hate

speech, incitement, obscenity, or defamation, Defendants may remove such

comments.

//

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Plaintiff's Motion for Preliminary Injunction (ECF No. 4) is
   **GRANTED.**

   a. Defendants are ordered to make Plaintiff's past comments publicly
      visible again by "un-hiding," them.

   b. Defendants are enjoined from enforcing the Disclaimer against
      Plaintiff for the pendency of this litigation.  Should Plaintiff
      engage in speech not covered by the First Amendment, hate
      speech, incitement, obscenity, or defamation, Defendants may
      remove such comments.

2. No bond is required from Plaintiff under Federal Rule of Civil Procedure
   65(c).

The District Court Executive is directed to enter this Order and furnish
copies to counsel.  Each party to bear its own costs.

DATED July 16, 2024.



THOMAS O. RICE
United States District Judge

ORDER GRANTING PRELIMINARY INJUNCTION ~ 34